**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION**

---

Russell Miller Acquisition, Inc.,

    Plaintiff,

vs.

Deluxe Small Business Sales, Inc.
and Deluxe Corporation,

    Defendants.

**COMPLAINT**

---

Plaintiff Russell Miller Acquisition, Inc. ("Plaintiff"), for its Complaint against defendants Deluxe Small Business Sales, Inc. and Deluxe Corporation (collectively, "Defendants"), alleges as follows:

## Preliminary Statement

This diversity action arises out of the sale of a distressed business by Defendants to Plaintiff for $1,500,000.00. After the sale was completed, Plaintiff discovered that Defendants had falsely inflated the value of the assets by almost $1,000,000.00, which had induced Plaintiff into going through with the purchase at the agreed-upon price. Plaintiff seeks in this action recovery from Defendants of all damages caused by their misconduct in this regard.

1

**Jurisdiction And Venue**

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because it involves a dispute between citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

2. Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the acts or omissions giving rise to the claims herein occurred in this judicial district or because the Defendants have consented to personal jurisdiction in this district.

**The Parties**

3. Plaintiff is a Delaware corporation with its principal place of business located at 10425 Slusher Dr., Santa Fe Springs, CA 90670.

4. On information and belief Defendant Deluxe Small Business Sales, Inc. ["Sales"] is a Minnesota corporation with its principal place of business located at 3680 Victoria St. N., Shoreview, MN 55126-2966.

5. On information and belief Defendant Deluxe Corporation ["Deluxe"] is a Minnesota corporation with its principal place of business located at 3680 Victoria St. N., Shoreview, MN 55126-2966.

6. On information and belief at all relevant times Sales was a wholly-owned subsidiary of Deluxe.

7. On information and belief at all relevant times Deluxe possessed and exercised complete domination and control over Sales' business and affairs, including without limitation the transaction which is the subject of this litigation.

**The Business**

8. Prior to 2007, Defendants operated a business known as Russell & Miller [the "Business"]. The Business was a retail package and signage operation.

9. By at least 2008, the Business was in distress, with continuously declining sales.

10. In 2008, Defendants decided to shut down the Business. Thereafter, Defendants marketed the Business for sale.

11. Subsequently, Plaintiff became interested in acquiring the Business, and commenced its due diligence on the same.

**The Inventory**

12. In each of November 2008, December 2008 and January 2009, Defendants delivered to Plaintiff financial statements for the Business [the "Interim Financials"].

13. The first set of Interim Financials was dated as of October 31, 2008 and valued the Business's inventory at $1,798,760. A copy of the same is attached hereto at Exhibit A and incorporated herein by this reference.

14. The second set of Interim Financials was dated as of November 30, 2008 and valued the Business's inventory at $1,758,494. A copy of the same is attached hereto at Exhibit B and incorporated herein by this reference.

15. The third set of Interim Financials was dated as of December 31, 2008 and valued the Business's inventory at $1,774,353. A copy of the same is attached hereto at Exhibit C and incorporated herein by this reference.

16.  Plaintiff justifiably relied on the Interim Financials in proceeding with the transaction, and continuing to expend resources to pursue the Business.

17.  On or about December 31, 2008, Defendants, or either of them, reduced the value of the Business's inventory on their books and records by $1,738,534.32, down to almost zero.

18.  Defendants' severe reduction in the value of the inventory on December 31, 2008 was not based on Defendants' actual sale of product since the date of the Interim Financials. Nor was it based on a theft, or even a previous miscounting of the inventory. Rather, on information and belief it was based on Defendants' recognition of the fact that much of the inventory was obsolete and unsalable.

19.  Defendants did not disclose to Plaintiff, and did conceal from Plaintiff, their drastic reduction in the value of the Business's inventory.

**The Transaction**

20.  As a result of Defendants' concealment of the true value of the inventory, Plaintiff closed on its purchase of the Business and thus acquired the Business. Plaintiff did so pursuant to an Asset Purchase Agreement dated as of January 31, 2009 [the "Agreement"], a copy of which is attached hereto at <u>Exhibit D</u> and incorporated herein by this reference.

21.  Schedule 1.1(b) to the Agreement lists the value of the inventory as $1,922,050.

22. In Section 5.7 of the Agreement, Sales represented and warranted to Plaintiff that, since November 30, 2008 there had not been any "revaluation...of any of its assets or properties...."

23. A significant and material inducement to Plaintiff for proceeding with the transaction beyond 11.30.08, and for closing on the transaction and actually acquiring the Business, was the value of the Business's net working capital, including the inventory.

24. As a result of Defendants' failure to disclose their drastic reduction in the value of the inventory, Plaintiff was fraudulently induced to acquire the Business when it otherwise would not have done so.

25. Plaintiff paid $1,500,000 for the Business.

26. As a result of Defendants' failure to disclose their drastic reduction in the value of the inventory, Plaintiff paid substantially more for the Business than it would have otherwise, *assuming* that it would have acquired the Business at all.

**The Purchase Price Adjustment Clause**

27. Plaintiff acquired the Business on an expedited basis and with only limited due diligence, for two reasons. First, the Business was in decline, and deteriorating rapidly. Waiting too long could have led to the Business being shut down.

28. Second, Plaintiff insisted on, obtained and relied on a clause in the Agreement pursuant to which Plaintiff could determine the Business's net working capital after closing and have the purchase price adjusted if the net working capital was above or below a predetermined target.

29. Section 3.3 of the Agreement reads in relevant part as follows:

3.3 <u>Working Capital Adjustment</u>. Following the Closing Date, the Purchase Price will be adjusted as follows:

(a) <u>Closing NWC Preparation.</u> Buyer will prepare, at its cost, and deliver to Seller by February 28, 2009 a calculation of the Net Working Capital of the Business as of the Closing Date (the "Closing NWC"). The Closing NWC will be prepared in accordance with GAAP, with GAAP being applied in a manner consistent with past practices of Seller.

(b) <u>Closing NWC Review.</u> Within 30 days following Buyer's delivery of the Closing NWC to Seller, Seller may give Buyer a written notice stating either (i) Seller's acceptance, without objection, of the Closing NWC (an "Acceptance Notice") or (ii) Seller's objections to the Closing NWC and Seller's determination of Net Working Capital (an "Objection Notice"). If Seller gives Buyer an Acceptance Notice, or does not give Buyer an Objection Notice, within such 30-day period, then the Closing NWC will be conclusive and binding upon the parties.

(c) <u>Audit Review.</u> [If] Seller timely delivers an Objection Notice and Buyer and Seller fail to resolve all of the issues set forth [therein] within 30 days...(i) Seller and Buyer will retain a firm of certified public accountants mutually acceptable to [them] (the "Independent Auditors") to determine the Net Working Capital in accordance with the terms of this Agreement within 30 days after they have been retained, and (ii) Seller and Buyer each will provide the Independent Auditors with their respective determinations of the Net Working Capital. The determination of the Net Working Capital by the Independent Auditors will be conclusive and binding upon the Parties. The...expenses of the Independent Auditors will be paid 50% by Seller and 50% by Buyer. All determinations pursuant to this Section 3.3(c) shall be in writing and shall be delivered to the parties hereto. The Net Working Capital of Seller as of the Closing Date as determined pursuant to Section 3.3(b) or this Section 3.3(c)...shall be the "Final Net Working Capital."

(d) <u>Adjustment Payment.</u>

(i) If the Final Net Working Capital is greater than $2,325,000, then the Purchase Price will be adjusted upward by the amount of such excess, and Buyer will pay to Seller the amount of such excess...within five days after the determination of the Final Net Working Capital.

(ii) If the Final Net Working Capital is less than $2,225,000, then the Purchase Price will be adjusted downward by the

6

amount of such deficiency, and Seller will pay to Buyer the amount of such deficiency...within five days after the determination of the Final Net Working Capital.

(e)   For purposes of this Agreement, "Net Working Capital" shall mean without duplication, (i) the sum of Seller's trade accounts receivable net of reserves (as set by Seller on the Closing Date) for uncollectability, **inventory net of reserves**, prepaid current assets, less (ii) the sum of the Company's accounts payable, accrued expenses and other current operating liabilities; each such item as determined as of the Closing Date [emphasis added].

30.  Section 3.3 of the Agreement constituted a significant and material inducement to plaintiff for proceeding with the transaction beyond November 30, 2008, and for closing on the transaction and acquiring the Business.

31.  Upon investigation after closing, Plaintiff learned that the true value of the inventory as of closing, net of reserves, was $818,807. Under Section 3.3 of the Agreement, this produces a net working capital of $1,279,991, and mandates a $945,009 decrease in the purchase price.

32.  Plaintiff thereafter demanded a decrease in the purchase price, but defendants refused, asserting that Plaintiff was not entitled to any adjustment in the purchase price.

33.  Subsequently, the parties engaged Ernst & Young LLP ["E&Y"] to determine the Business's net working capital as of closing, as required by the Agreement. However, E&Y failed to determine the Business's net working capital as of closing, per the Agreement. Instead, E&Y summarily concluded that Defendants' position was correct.

**Defendants' Concealment**

34. Several managers and employees of Deluxe actively participated in the marketing and sale of the Business to Plaintiff. Said individuals included without limitation Greg Gerard, John Vo and Barbara Baklund. On information and belief said individuals also directed and controlled the acts and omissions of those employees of Sales who participated in the marketing and sale of the Business to Plaintiff.

35. Following its acquisition of the Business on January 31, 2009, Plaintiff had direct access to the Business's employees, including those responsible for marketing and selling the Business to Plaintiff.

36. Upon investigation after closing, Plaintiff learned that employees of the Business had informed Greg Gerard, John Vo and/or Barbara Baklund, all employees of Deluxe, in August 2008 that much of the inventory was obsolete and/or unsalable; and that the reserve for obsolete and/or unsalable inventory, as shown on the books and records of the Business, was at least $700,000 too low.

37. Upon investigation after closing, Plaintiff learned that employees of the Business had informed Greg Gerard, John Vo and/or Barbara Baklund, all employees of Deluxe, again in November 2008 that the reserve for obsolete and/or unsalable inventory, as shown on the books and records of the Business, was at least $500,000 to $600,000 too low.

38. The reserve for obsolete and/or unsalable inventory on the Interim Financials was grossly understated, and not accurate.

39. The reserve for obsolete and/or unsalable inventory set forth in the Agreement was grossly understated, and not accurate.

40. On information and belief at all relevant times Deluxe possessed and exercised complete domination and control over the marketing and sale of the Business to Plaintiff.

41. On information and belief Greg Gerard, John Vo and/or Barbara Baklund, all employees of Deluxe, intentionally failed and/or refused to increase the reserve for obsolete and/or unsalable inventory after being informed that the same was hundreds of thousands of dollars too low. On information and belief said individuals did so in order to fraudulently induce plaintiff to acquire the Business, and/or to pay substantially more for the Business than Plaintiff would have otherwise, *assuming* that it would have acquired the Business at all.

## COUNT ONE

## FRAUDULENT INDUCEMENT

42. Plaintiff repeats the foregoing as if set forth in full herein.

43. At the time of Defendants' delivery of the Interim Financials to Plaintiff, the reserve for obsolete and/or unsalable inventory set forth therein was grossly understated, and Defendants knew this.

44. At the time of Sales' execution of the Agreement, the reserve for obsolete and/or unsalable inventory set forth therein was grossly understated, and Defendants knew this.

45. Defendants, and each of them, misrepresented the value of the inventory to plaintiff. Defendants did so during the negotiation phase of the transaction as well as upon the closing of the transaction.

46. On information and belief, Defendants made said representations to Plaintiff with the intent that Plaintiff rely on the same; and Plaintiff did in fact justifiably rely on the same in acquiring the Business and paying $1,500,000 therefor.

47. On information and belief, Defendants made said representations to Plaintiff in order to induce Plaintiff to acquire the Business when Plaintiff would not have otherwise done so.

48. On information and belief, Defendants made said representations to Plaintiff in order to induce Plaintiff to pay substantially more for the Business than Plaintiff would have paid otherwise, *assuming* that Plaintiff would have acquired the Business at all.

49. Defendants' representations to Plaintiff were material and were relied on by Plaintiff in entering into the transaction and acquiring the Business, and paying $1,500,000 therefore.

50. On information and belief Defendants, and each of them, were aware of the falsity and materiality of their representations, as well as Plaintiff's reliance on the same.

51. Plaintiff's reliance on Defendants' representations was justifiable, as only Defendants knew the portion of the inventory that was saleable and the portion that was obsolete and/or unsalable.

52. Defendants' December 31, 2008 reduction in the value of the inventory was effected by posting an "R&M impairment charge (K Daul)" to Sales's general ledger

account, no. "118102 Inventory - Finished goods - obsolete reserve." A copy of said posting, being Document No. 100288052, is attached hereto at <u>Exhibit E</u> and incorporated herein by this reference.

53. Defendants' recording of the massive impairment charge on December 31, 2008 evidences that defendants knew the true value of the inventory as of December 31, 2008, a full month before closing.

54. Deluxe valued the Business's inventory at $36,000 in its 2008 annual report. This constituted yet further evidence that Deluxe knew the true value of the inventory as of December 31, 2008, a full month before closing.

55. Plaintiff executed the Agreement and acquired the Business in reliance on Defendants' representations and has been injured as a result thereof, in that Plaintiff would not have acquired the Business at all had it known the true value of the inventory.

56. Plaintiff paid $1,500,000 for the Business in reliance on Defendants' representations and has been injured as a result thereof, in that Plaintiff would not have paid anywhere near this much for the Business had Plaintiff known the true value of the inventory, *assuming* that it would have acquired the Business at all.

57. By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but reasonably believed to exceed $50,000.00.

58. Agents of both Deluxe and Sales actively participated in the marketing and sale of the Business to Plaintiff. As such defendants are jointly and severally liable for any damages to which Plaintiff is entitled.

## COUNT TWO

## NEGLIGENT MISREPRESENTATION

59. Plaintiff repeats the foregoing as if set forth in full herein.

60. As described above, Defendants supplied false information regarding the true value of the Business's inventory to Plaintiff for Plaintiff's guidance in a business transaction, namely the transaction memorialized by the Agreement.

61. Defendants had a pecuniary interest in said transaction.

62. Defendants supplied said false information to Plaintiff without exercising due care or competence in obtaining or communicating the information.

63. Plaintiff justifiably relied upon the false information provided by Defendants in deciding how much to pay for the Business, *assuming* that Plaintiff would have acquired the Business at all.

64. Plaintiff has been damaged by the Defendants' negligent misrepresentation in an amount to be determined at trial, but reasonably believed to be in excess of $50,000.00.

## COUNT THREE

## BREACH OF CONTRACT

65. Plaintiff repeats the foregoing allegations as if set forth in full herein.

66. The Agreement constitutes a valid contract, legally binding on each of Plaintiff and Sales.

67. Plaintiff has performed all of its obligations under the Agreement.

68. In Section 5.7 of the Agreement, Sales represented and warranted to plaintiff that, since 11.30.08 there had not been any "revaluation...of any of its assets or properties...."

69. On or about December 31, 2008 Sales, either alone or together with Deluxe, recorded a $1,738,534.32 impairment charge against the inventory on Sales' books and records which reduced its value down to almost zero.

70. Said impairment charge constituted a revaluation of Sales' inventory, and thus one of its assets.

71. Said impairment charge constituted a flagrant, intentional breach of Sales' representation and warranty in Section 5.7 of the Agreement.

72. By reason of the foregoing, Plaintiff has been damaged in an amount to be proven at trial, but reasonably believed to exceed $50,000.00.

73. Agents of Deluxe actively participated in the recording of the impairment charge pursuant to which the value of the Business's inventory was reduced down to almost zero. As such, Deluxe is jointly and severally liable with Sales for any damages to which Plaintiff is entitled.

## COUNT FOUR

### SPECIFIC PERFORMANCE

74. Plaintiff repeats the foregoing as if set forth in full herein.

75. Pursuant to Section 3.3 of the Agreement, Plaintiff is entitled to a $945,009 reduction in the purchase price plaintiff paid for the Business.

76. Notwithstanding the same Defendants, and each of them, have failed and refused to reduce the purchase price below the amount which Plaintiff originally paid.

77. Said refusal constitutes a breach of the Agreement.

78. Plaintiff is entitled to specific enforcement of the Agreement.

79. In addition to the above, Plaintiff is entitled to monetary compensation for the delay in performance of the Agreement.

80. By reason of the foregoing, Plaintiff is entitled to an order declaring that the purchase price which plaintiff paid for the Business is reduced by $945,009.

81. Also by reason of the foregoing, Plaintiff is entitled to monetary damages for Defendants' delay in performing the Agreement in an amount to be determined at trial, but reasonably believed to exceed $50,000.00.

**WHEREFORE**, Defendants pray that the Court grant the following relief:

1. Awarding judgment in favor of Plaintiff and against the Defendants, and each of them, on Plaintiff's claims, and on each of them, in an amount exceeding $50,000.00 to be determined at trial;

2. Upon motion timely made, grant leave to Plaintiff to amend its Complaint to add claims for punitive damages pursuant to Minn. Stat. §§ 549.191 and 549.20;

3. Ordering Defendants, and each of them, to specifically perform the Agreement by lowering the purchase price and awarding judgment based on Defendants' delay in performing the Agreement in an amount exceeding $50,000.00;

4. Awarding Plaintiff its attorney's fees and costs incurred in this litigation;

5. Awarding Plaintiff pre- and post-judgment interest; and

6. Awarding Plaintiff such other and further relief as the Court deems just and equitable under the circumstances.

Date: 6/9/11

**MANSFIELD, TANICK & COHEN, P.A.**

By: _____
Seymour J. Mansfield (#67271)
Brian N. Niemczyk (#386928)
1700 U.S. Bank Plaza South
220 South Sixth Street
Minneapolis MN 55402-4511
(612) 339-4295

and

**WATSON BENNETT COLLIGAN & SCHECHTER, LLP**

A. Nicholas Falkides (NY Bar #2639847)
*Pro Hac Vice* Admission Pending
12 Fountain Plaza, Suite 600
Buffalo, NY 14202
(716) 852-3540

**ATTORNEYS FOR PLAINTIFF RUSSELL MILLER ACQUISITION, INC.**